15-3040 Ernest McCowen v. Village of Lincoln Heights Argument not to exceed 15 minutes presides. Mr. Forge, you may proceed to the appellant. 5 minutes for rebuttal. Your Honor, this is a case of retaliation based upon an association with a member of the Engagement Protected Act. This is an appeal from the Granite Summer Judgment. In the course of this appeal, the defendant has argued for the first time that the degree of association was one that would not give, was to allow the case to proceed. And this is sort of classified as a causation element, which we'll discuss later, but it's more popularly an issue of standing. Now, this type of case was recognized by the U.S. Supreme Court in Thomas vs. North American Steel Company in 2011. That was a fiancé? That was a fiancé, Your Honor, but the first issue there was whether or not the person needed to engage in protected activity. That is, whether a case by association existed in the court found that it didn't. Then he went on to discuss something he referred to, which he later referred to as a zone of interest, which people within the zone of interest would have standing. I think it's interesting, when he talked about that zone of interest, he said that the statute protects people in the workplace, and even though the fiancé was the one who engaged in protected activity, her fiancé, Thompson, was also an employee there. So the protection brought him within the zone of interest was not so much his status as a fiancé, but his status as a coworker. Can you give me a flavor for how close the relationship was between Chief Solomon and the plaintiffs? Okay. There was a long history. Essentially, everyone in the fire department had, who were a number of people who had been in the fire department for 3 or 4 years. These two people were both sons of former fire department people. They were people that were specifically promoted by Mr. Solomon. It's important to realize here that they were specifically hired by Mr. Solomon as firefighters. They had been volunteers. They were promoted to part-time positions. That would be the equivalent of a professional, and reassigned to shift as firefighters by Mr. Solomon. There were other people who contested that. Most of those were people who had been hired, but did not come up to the fire department. They had come up somewhere else and were hired on the outside. There was sort of these two factions, as you know. Mr. McGowan and Mr. Turner were in the faction, or at least of the old guests. At the time they were hired, I think there are two things. Don't you have a tough issue to overcome in the fact that they committed that they would go get a DMVC certification, because even though they were fire professionals, most of the professionals in that range had a DMVC certification. They didn't, so they must get it, so that's a problem. Don't you also have a temporal proximity problem? Because the adverse action occurred, what, seven, eight, nine months after this other event? No, that's not true. Temporal. After some of the initial things, there was a lawsuit filed. The lawsuit was pending at the time. In fact, there's a court- The filing of the lawsuit was ongoing. It happened in February, and it continued on. The retaliation— Well, you can't have a rally that's ongoing. I mean, a rally is a discreet event. Well, there— You file a claim, and then it may be pending, but— There's a distinct correlation between— It's retaliation for the protected activity. The protected activity is filing the lawsuit. The protected activity is not keeping the lawsuit going, I promise you. That's right. There's a correlation between actions that take place in the filing of the lawsuit, in the prosecution of the lawsuit, and the subsequent retaliatory actions taken by Ms. Cross. In this case, motions for summary judgment were filed just before the actions were taken against these two individuals. And also, I believe, the items that deal with pretext show that it would not have been but for the pending lawsuit for these prior acts of protected activity that she never would have brought— We talked about— Have your clients gotten their certification? They haven't been employed. They have other careers now. Did she— Do you want to say— I mean, listen. Did she get the darn certification? I mean, your clients admitted they were supposed to get it, right? No. No, they have not. They weren't hired as firefighters, Your Honor. They were— What happened was they did not say they understood that this promotion was contingent on eventually getting certification. No, it was not contingent at all. They were— As Chief Sullivan has said repeatedly throughout in his depositions, that's what he— They were hired as firetrucks. The problem was they could not operate firetrucks unless they had three people who were in their schedule. They did not have three EMT people, so they hired someone who was only— So, Your Honor, just to make sure I'm getting this, your theory of the case is they never had any obligation to get certified. That's right. If you will read the transcripts of— I mean, I'll read what you want me to read. But I'd really like to help clarify what you, the lawyer, think of the theory of the case. Exactly. The guy in the case, is they had no obligation to get certified? Did you read the testimony of Charles Thompson? Yes or no. Is your theory of the case they had an obligation to get certified? Yes. Charles did not decline the yes or no question, Your Honor. They had no formal obligation. Yes, they had an informal agreement with Chief Thomas, as Chief Thomas has testified in his deposition. It wasn't a condition of employment. The theory of the case is they had no obligation, no need to get certified, they should have been able to keep this job and never have to get the training or get certified. The testimony was that if they were not certified within a year, that they would be dropped as part-time employees, but kept on at a longer term. And that did not happen. Your theory of the case in terms of damages, is damages related to firing, not damages of the defermentation of the part-time? Your Honor, look, the testimony from everybody, from Stephanie DeMoss and her hearing, is that there was no time table set. She specifically says, I quote her there, and I've never said that. Just to make sure I understand the answer to the last question, your clients want to be hired to the position we have. Their complaint doesn't say, give us the part-time job. Am I right about that? I don't think, because of subsequent changes, I don't believe they're seeking reinstatement at this point. They're simply seeking damages for that loss of their employment. But this damage is related to the full-time job, not the part-time. The part-time, they only had a part-time job, Your Honor, which means they worked 212 hours part-time as opposed to volunteer. Yes, right. The damage is related to not having a part-time job as opposed to volunteer. Right. It's our contention. They were going to take, because there was no case available in 2012, they were scheduled to take the certification at the beginning of 2013, the first time they were going to be able to do it. It would have been impossible for them to, and there was no timeline stating when they had to comply. Well, there was testimony that there was a requirement to be done within a year. There were several opportunities for them to have taken that training within a year, but for whatever reason, that didn't happen. They were assigned for the class in June, and that class was canceled because of small enrollment. There were no other opportunities necessarily available for them at that time. But didn't they, at one point, say that they couldn't take it because they didn't have the money to take it? Well, that was with regards to several of the classes in pointed depositions. There were some other programs that were pointed out. There was no evidence that they possibly were offered at this time, but they were either far enough away that it would require commuting on distance or full-time enrollment, and they didn't get it. But the point is that there were opportunities within the relevant period for the gentleman to get the certification that they needed. I don't believe so, Your Honor. Everybody going through the write-up system, the only one they offered was in the only one they had. When they were first hired, it was still a term of enrollment, and they were first in June. They did enroll on that one, but it was canceled. The next class would have been the following January, and they were prepared to enroll for that one before they were terminated. The enrollment period hadn't started yet. So we think they did everything that they were able to do to try and get the certification. Now, does it trouble you at all that they lacked some essential part of the training that all the other firefighters did for doing the job? Except the fact that they were hired as firefighters, not as EMT firefighters. Yes. Some of the classifications, EMT firefighters. Yes, firefighters. It's a separate position. Those people can do EMT runs. They were hired because, and even after the termination, this was true, the fire department could not make its fire runs. There's testimony that 10% to 15% of the runs that would be effected if there's an emergency called a random fire, they were unable to make in violation of state law, which requires them to provide fire protection, because there was not enough people to man a fire station. They were hired specifically to fill that gap. It would have been nice if they would have been able to get their EMT certification. It would have been more flexible. It would have been more help. But their immediate purpose was to allow the department to make fire runs. And that's why they were hired. I would also say that most of the calls that came in to the fire department required there to be some EMT certified component on the response team. Let me answer this question. I don't have time to turn it up. They were scheduled two people at all times in the department that they had. But to get a third person to make a fire run, because it only required two people to run an ambulance, it required three people to run the fire truck, they needed to have a third person. And these two people were specifically hired. John would ask the question, don't most runs require EMT people? Yes, these are two people who were regularly scheduled. Okay, thank you. They placed the court on behalf of Appellee's Village, Lincoln Heights, Ohio, and Stephanie Dumas. This is a simple case about two firefighters who failed to obtain EMT certification required to perform 90% of their job that everyone else had, that every fire department in the area required, and that they agreed to get. When they failed to obtain the certification within the one-year period they were told to, they were terminated by the village manager. They don't claim they personally engaged in the type of activity. Rather, they assert third-party retaliation claims based on the type of activity of Chief Sullivan and his harassment lawsuit against the village manager. They allege two instances of retaliation. First, the December 31, 2011 officers meeting, where the village manager addressed co-worker complaints that their lack of EMT certification was causing unfair pay and workload issues to the other firefighters. And second, their late fall 2012 termination. Summary judgment must be affirmed for two main reasons. First, accepting the third-party retaliation argument that Thompson automatically extends to every employee who works with or passively observes a co-worker's protected activity would immunize entire workforces from summary judgment on this issue. Second, they can't show but-for accusation or pretext because no reasonable juror would disregard the substantial evidence that their failure to obtain the EMT certification report could make at least one mistake, or at least snap through the so-called cause point. That's correct, Your Honor. The district court misinterpreted the Buford standard under the Nassar, but it's explained in our brief. We believe that was a harmless error because it actually applied the right standard. What is the appropriate standard? I'm a little confused here. What are the standards? The appropriate standard is set forth in this court's 2014 Skiln-Vasquez v. Ohio State University decision, which interprets Nassar as if a termination was motivated by both legitimate and illegitimate reasons, you can't show but-for accusation under Nassar. Is that what we hear? A legitimate and illegitimate reason? Well, the district court said, even assuming there's a legitimate reason, even assuming the village manager directed someone to terminate these firefighters to embarrass them, that no reasonable juror conditions are that they were also terminated for their failure to obtain EMT certification. So that was the district court's finding, and we believe the district court still applied the right standard and, therefore, that any error was a harmless error in that matter. So on this Thompson impression of zone of interest, I get the problem that if you say this goes down in family relationships, just about every workplace has four factions to use with. But the Supreme Court cases in this area talk about whether a reasonable person might be dissuaded from exercising their rights by that type of a violation, and I suspect the average person in the workplace, if they knew the employer would respond to what they're doing by firing their friends in the workplace, that would affect whether they exercised their rights. Also, I find myself not sure what to do on this point. Sure, that standard's absolutely right, and that's what the issue comes down to. But that inquiry must be viewed objectively under the circumstances, and in this case... Do you know anyone that wouldn't be affected by whether to exercise their civil rights in the workplace by whether, if they knew the employer would retaliate by firing their friend? I'm not sure if I understand your question. If you don't, that wouldn't bother you. I'm making the point. I mean, this has this long, slippery slope, but if we follow what the court says we're supposed to follow, you're sitting there, you're working for me, you want to exercise your civil rights against me, you think I'd discriminate against you. If you file an action against me, you're afraid I'm going to retaliate by firing your friend in the office. Might that affect whether you exercise your civil rights against me? Under certain circumstances. But not under the circumstances... What defense do you have that you wouldn't be worried about getting fired? Well, it comes down to... Get a view of the context. The fire chief is a supervisor, and these were subordinate firefighters who lacked certification on part of their 90% of their job, and the EMT certification issue was raised independently and before any evidence-of-effect activity. So given the circumstances, we don't think this falls under Thompson and third-party retaliation claims following that precedent. But I guess your other argument is you don't have to reach this issue. The other argument is you don't have to reach this issue. On pretext, the plaintiffs, McAllen and Turner, given these facts, no reasonable juror could conclude that their termination was not motivated by legitimate reason of their W-13 EMT certification. They admitted that they agreed to get EMT certified, which was the day they were promoted from volunteer to part-time. Assistant Chief Thomas, after this officers' meeting, conveyed to them that you guys need to get EMT certification within one year, and Turner admitted that he agreed to do it on 173 of the record, and McAllen on page 101. What Mr. Ford's argument really comes down to is... Dumas testified that he didn't say it was one year before the meeting. That's correct. Dumas raised this concern at the officers' meeting with officers. The Assistant Chief and the Fire Chief Solomon were there. Fire Chief Solomon and the Assistant Chief met after that meeting and discussed the EMT certification issue and said, yeah, they should get certified. But Chief said, her testimony is, I did not say it can't be completed in a year. What do I do with that? Well, it was Thomas who actually conveyed the one-year requirement, and they agreed to that one-year requirement. What Mr. Ford's disputing on here is the consequence of their failure to get it within one year. When Thomas said, you guys need to get EMT certified within one year, he said something along the lines of, if you fail to do so, you'll be demoted from part-time to volunteer and taken off the schedule. But it's not up to Thomas to decide the consequence of their failure to do that. That's up to the village manager who had the ultimate authority to hire the fire. Okay, I want to ask a question about the one-year again. Sure. Is the one-year just an arbitrary timeframe? Is it a modern policy? It's pretty magic about one year. And the village manager said it's okay to hire people in this position without this certification for a year. Maybe two months, 24 months. It's pretty magic about that. The origin of the length of the time isn't entirely clear for the record. But what it appears to be is that there's a long history of them failing to get EMT certified. They took these classes in high school, failed the test. They failed to utilize additional opportunities to retake that test. A couple years later, when they're hired on as volunteers, the village paid $4,000 from its already streamed budget for them to take the classes again. They failed that test. They failed to utilize additional opportunities to retake that test. So it was a culmination of their history of their failure to get EMT certified that the one-year issue was mentioned and that it was a sort of ultimatum that you guys need to do this if you want to have this job. Ninety percent of the runs that the village received required two EMTs. Everyone has had it. Every fire department in the area required it. Would the chief, he wants to be hired if they got the certification? She testified in the personnel board hearing following the determination that she would consider rehiring them if they did. And in McAllen and Turner's depositions, they both testified that they hadn't gotten EMT certified. And one of them testified that they couldn't find a job anywhere else because they didn't have the EMT certification. And it's not as if the one location, the Scarlet Roach location, the class they signed up for in June 2012 was the only available place. There's evidence in the record that there were at least six places in the area where they could have taken these classes and taken this test. And there's testimony from everyone in the fire department that some people offered to pitch in for the price of these classes to give them rides. And that's because this EMT certification issue helped out everyone. It helped them be more remarkable in their careers. It helped the village be better equipped to respond to runs. It helped the workload issues within the department. And I want to touch on Mr. Ford's point as to Thompson. Thompson involves two distinct issues. It involves, first, whether Thompson was able to advance a retaliation plan, and second, whether he had standing to do so. The zone of interest test mentioned in Justice Scalia's opinion concerns the standing issue. We're not contesting standing. What we're contesting is that they don't have a viable third-party retaliation plan based on the closeness of the association. What's the line? What's the line to use? The line that should be used is two important considerations. First, the closeness of the association, particularly whether there's a family or romantic relationship. And secondly, whether there's some sort of link between the third-party and the protected activity. When you've got a family or romantic relationship, you're always going to have some sort of link to protected activity, whether it be sympathy, support, speaking in support of the employee, advocacy. But once you get outside that context, then the issue becomes more tenuous. So it just doesn't apply to friends, or it applies to some friendships? It applies to some friendships and some sort of relationships. So it's not really good friendships, but not okay friendships? It depends on the circumstances. And under these circumstances, given the importance of this requirement at the time of when it was raised, before the protected activity, it's not on the table. So if you saw these two kids grow up, and you're a neighbor of these two kids, and you helped hire them on the force, does that cross the line that Judge Sullivan's talking about, that a close friendship? We don't believe it does, because the relationship started when they were kids. It was decades old, before the parent-child relationship happened to start that way, too. It was pretty close. But that's a family relationship. That's much closer to Thompson in this case. This was a close-knit department. There were only 11 firefighters on staff. Nine of them were on this side of the department that had been there for a while, and grew up with Chief Sullivan. All nine of them had that same type of relationship. We don't think that Thompson would have enabled third-party retaliation claims on behalf of all nine of them. You have to look at the closeness of the association, and once you get outside of the family or romantic relationship context, it's... Why aren't you willing to say it's only family relationships? Some of our kids are closer with family. And that's true. The Supreme Court decision in Thompson set forth a sliding scale. It said terminations against family members were almost always satisfied, and milder reprisals against mere acquaintances were. So it's kind of a sliding scale, and the Supreme Court decision in Thompson suggests that a parent-child relationship most likely satisfies that standard. I want to touch on the temporal proximity argument that Judge Donald mentioned earlier. So there's two instances of retaliation, the December 31, 2011, officers' meeting and the termination. For the officers' meeting, there's no evidence in the record that the village manager was aware of Sullivan's alleged December 2011 harassment complaint that got going there. Therefore, there's nothing to measure temporal proximity from for that instance. So turning to the termination, you're exactly right with the gap between the protected activity and the termination, even if you begin to measure that from the date that Sullivan filed that lawsuit, which was February 22, 2012, all the way through their October 29, 2012 termination. That's a period of seven or eight months, and several circuits have found that the mere existence of a lawsuit doesn't establish continuous, overt, persistent protected activity throughout the entire course of that lawsuit. It's measured from the discrete event of the filing of the lawsuit, and there's no evidence in the record explaining what this alleged ongoing harassment was throughout that lawsuit. There's no evidence that any similarly situated firefighters were treated differently. Mr. Forge-Reeves cites two firefighters, Stewart and Rainey, who didn't have EMT certification. Rainey was a volunteer. He had a different position. And Stewart, he was a part-time firefighter, but he left before they were terminated. Therefore, at the time of their termination, they were the only part-time firefighters who lacked EMT certification. I want to show who was hired afterwards and whether they knew part-time people had EMT certification. The witnesses unanimously testify that everyone, every part-time firefighter since they left has had EMT certification. How far does the record go? How long after their filing does that go? A year, two years? The depositions were in spring 2015, and that's when that testimony was. Four years? It would be from their October 2012 terminations through the time of those two additions. I've got just a couple of statements here. In short, accepting their arguments means the village was effectively handcuffed from terminating two employees unable to do 90% of their job. The court has no further questions. That's all. Thank you, Mr. Forge. Thank you, Your Honor. With regards to the issue of Tonson, I think that in how far the sum of interest would extend, I think that there's some guidance here from a prior decision of this court, Barrett v. Local Corporation, that dealt with discrimination by association, not necessarily retaliation. But the court held in that case that the key issue here for standing is that the scope of the Title VII is to protect people from workplace discrimination. I would assume the same applies here, to protect employees from workplace retaliation. So they said in that case the substance really will be the winnowing factor. As long as the person's in the workplace, then the degree of association doesn't matter. If they can show the causational link between the two, then the degree of the association is immaterial. So what's your basic point? Your basic point, I know your basic point is these people aren't a family. Is it all friends? It would be all co-workers. All co-workers. Friends or not? Whether it's 11 or 11,000. 11,000. But the key here is you still have to prove the causal links between the two. And that degree may be a factor in the causal links. But some of them wouldn't necessarily agree in standing. And according to Barrett, that's exactly what they said. I've quoted it in one piece. As long as you can prove the other elements, then the degree of association is not relevant. Now, here I think in this case it's key to remember that state law requires a municipal fire department to make a fire. Without Mr. McGowan, the village of Lincoln Heights is unable to make a fire department because they could not consistently keep three people at the fire station at the same time. There was an assessment at this point that there was only one volunteer fireman. You just said that every part-time person hired after him. I mean, I went to you. But that's not true. That's not true, Your Honor. What is the downside? There is no downside, I take it, with part-time people requiring all part-time people to have M.T. certification, right? Yes, there is none. Under that requirement, no. But that requirement was not in place until after my fire. I'm just trying to remember the stuff you text, the points I text, whether they were lying to hide their discriminatory animus or retaliatory animus. And that's the question. Right. Well, then my response would be that firing two plaintiffs was like shooting themselves in the foot because then they were no longer, and there's an estimate in the record that they are no longer able to make the firearms. Ten percent? Ten percent. But they're going to lie until they get replaced. If everybody replaced them at M.T. But they did not run. They didn't. For some reason, they never did. They never did what? They never replaced them. I thought there were part-time people hired in the next several years. No. Not that I'm aware of. And not for several years, at least. Okay, were the volunteers M.T. qualified? There was only one volunteer. He was not M.T. qualified. And he was not available enough to cover as a third person. That's why they needed to hire these two people and why they made an exception and only hired firefighters. Because they needed a third person at the station, and they did not have that with their personnel. So they were hired for this specific purpose. And that's, in fact, why there was this dispute with some of the older people, because they were upset that these people were not hired as M.T. firefighters, that they were only hired as firefighters, and they didn't have to. So they wouldn't have to go out on the M.T. lines. But they were specifically hired so that they would be able to make the fire lines. Now, at this meeting where people aired their differences, there was an informal agreement made between the assistant chief, Charles Thomas, and DuPont, that they would try and get their certification. And the best way to prove that this was pretextual would have been for your clients to get their certification and to come back to DuPont and say, hey, we got it, and then see what she does. But your clients didn't do it. Your Honor, I know, but I can't control my clients' actions. I mean, that's a lot of decisions. Believe me, that was what I had advised them to do. But nonetheless, they were terminating, you know, and I think the fact that the timing is completely arbitrary. I mean, it's just conformist. The city's right. These two guys thought they could have these jobs forever without ever getting certified. Well, no, they were told to get certified. They were trying as best they could to take the EMT class. They signed up to not try. Their best wasn't good enough. Well, after they were terminated, I mean, because they sought different careers then. But while they were still employed, every opportunity they had to try to sign up, there was only one opportunity. There's no more classes in all kinds of surrounding counties. There's no other opportunity. That evidence, Your Honor, is a couple of downloads from the Internet. It lists the courses that are potentially offered by a number of different institutions. We don't know if they were actually offered. Seriously, do you think I could not get EMT certified if I put my mind to investing on someone else? Well, if you don't have an automobile and you don't have the money and you're only making $2,000 a month, that's the conformist theory that they were not going to get. No, I think you're reading into it, Your Honor. I think they tried as best they can. Everybody went to the one place. They tried to get in there, and the class was canceled. You know, if the class hadn't been canceled, we wouldn't be here. They signed up for the next time the class was offered, which was 2 p.m. test, which they hadn't done before. P.m. they had failed, but that is correct. Okay, well, thanks to both of you for your helpful briefs and your arguments. Thank you, Your Honor. We appreciate it. The case can be submitted for the conformance case.